Discovery May it please the Court, Elliot Shurker on behalf of DTI. The dispositive question on this appeal is whether DTI stated a plausible claim for misappropriation of trade secrets. There essentially are two categories of trade secrets set forth in our amended complaint. First, trade secrets that we allege were actually transmitted to El Discovery, comprising revenue information provided to El Discovery by former employees in May of 2016, the misappropriation of which we have direct evidence, which is an e-mail from the former employees. I mean, how much each of them earned, is that it? The revenue. The revenue. The revenue they created, not just their earnings. So it's how much business they did. Yes, sir. That's a trade secret under New York law? It's a trade secret under their contract with us. Okay. And it's specifically identified as such where? The EPIC confidentiality agreement, which is in the appendix starting at page 217. Okay. Paragraph 2. Paragraph 2. 2 defines confidential EPIC information. And I will concede it is extremely broad. By the way, however, I would note that if you look at their former employees' agreement. Does it say revenue information? What it says is, let me get to the exact phrase, Your Honor, marketing or finances or other business information in any form. Now, the beginning of the sentence starts confidential information means any information of EPIC, including but not limited to, and then there's a long list, but specifically marketing and finance or any other information of EPIC. We concede it is a broad clause. We commend the court to the clause in their new contract with El Discovery, which is also in the record and is actually considerably broader than even our confidentiality clause. Could you explain what, with some greater precision, what exactly the competitive value of that figure for each of the departing employees was? By virtue of its secrecy, why did that provide, why was that a particular competitive value to your client? These are gross sales revenue figures for agents such as realtors tout all the time for themselves, and I'm having difficulty understanding why the disclosure of that kind of gross figure is of competitive harm and why it's, in fact, a trade secret properly understood. I understand, Your Honor, and I'm going to have to do a little bit of theoretical, a little bit of theory and answer to that because we're only at the motion to dismiss stage, and we allege in the motion to dismiss it is our confidential information. I'm sorry, in the complaint, it is our confidential information. But this is a very small industry. But you are alleging that it has competitive value, and you have to do that in order to make it? Not necessarily competitive value, just information we don't want others to know, information we don't want others to know. Part of the answer, I think, would be, although this is not within the four corners, if you look at Christopher Wyler's testimony in the injunction hearing, which the district judge actually cited in the dismissal order, he says, I would expect people would do this. I wouldn't like it if they did that. I wouldn't want them giving that information out. Now, this is El Discovery's CEO. But I can see why people would give it out. Well, you know what? El Discovery's confidentiality clause is so broad, it would readily and directly include that information. Now, why? This is a very, very small industry and a highly competitive industry. And you agree that the complaint doesn't allege that they disclosed anything other than the dollars that they each generate? In other words, they didn't disclose client names or any specifics such as that? Well, that's the second category, Your Honor. That's the information they took with them and that we don't have direct evidence that they disclosed. We do not concede that they didn't disclose it. But does the complaint allege that they disclosed any client names? It alleges that they took it with them. So we allege what we know when we file the complaint. We obviously were in the pleading stage. The answer is no. They didn't disclose. I already answered that, Your Honor. We do not allege that it was actually. Do not answer it. Go ahead. I apologize. The information was taken with them. And we do not have direct evidence that they gave it to Eldiscovery. We have circumstantial evidence that Eldiscovery induced them to take it. Now, we are at the pleading stage, and I believe it's a fair answer. They were induced with their sit-out year with lavish compensation. They were induced with one of the first things they demanded of Eldiscovery. And, Judge, I believe this gets to your question as well. One of the first things these former employees demanded of Eldiscovery in May 2016, in that same e-mail with the disclosure of the revenue information, was indemnification. Because they knew they were going to get sued. One of the interesting things about this case is that their peers have been compliant with the non-compete. They sat out for a year. I mean, were they supposed to wipe out from their memories and their minds everyone they had dealt with when they were employed by the plaintiff? Judge, let me give two answers to that. First of all, the sit-out year is over now. The sit-out year was not over when we filed the complaint and when we sought injunctive relief. I grant you that at this stage of the case, if the Court allows this case to go forward on the amended complaint, it's probably going to be much more of a damages case. And all the discovery we've done in support of the injunction will obviously be much broader. But we're talking about information in their possession. We also know, and we pleaded, Judge Chin, that within a month or two after they left, these employees got together and started preparing spreadsheets and all sorts of information. Now, this is during the sit-out year. And they called it the four horsemen plan. They were preparing their business plan during the year when they weren't supposed to be doing anything to compete with DTI while working for Eldiscovery. And the only reason they could — Did that violate the agreement? They were preparing to violate the agreement, Your Honor. No, no. Please, if you would just — you would get to cover a lot more things if you would just answer our questions. Did it violate the covenant not to compete? The act of putting the plan together. Yeah. Yes. It did? Yes. Where? Because they were preparing to compete with us. They had to do the work to compete. They couldn't go out and compete without planning to. They were planning to compete. And the only reason they stopped, Judge, was because we issued the cease and desist order. Okay. Now, to get back to your question, the threshold question here. We don't want, the people in this business don't want, Eldiscovery doesn't want, these key employees in this small business putting out their revenue information because that makes them a valuable choice to be cherry picked off, which is exactly what they did. So we don't want — Does that make it a trade secret? It makes it our business secret. You probably don't want anyone to know anything about how your business operates at all because why would it benefit you to have anyone know? So I'm not sure that that elevates that kind of gross revenue figure into a trade secret. Because it could hurt us if it were out in the public. The only exception — And how does it hurt you? Because our employees get cherry picked. So that to know, for a competitor to know that an employee is doing a good job. Yes. That makes them vulnerable to — Yes. In this small business. And Eldiscovery will tell you the same thing. They don't want that information out there now that these folks are working for them. Because their cause is even broader. I agree it's harsh, but people are well compensated, and they've got ample consideration for giving up the right to do what other folks would like to do. With respect to compensation, it was noticeable to me that you provided — you made allegations about bonuses and salary range, and yet we don't have any context for that. We don't know how much they were being paid in their current employment, so it's a little hard to tell whether these are large figures or small figures. The large figure, Your Honor, they had demands for about $200,000 a year in flat salary. The large figure was what they were paid during the sit-out year. They were paid to do nothing. But my point is that it is difficult to attach any meaning to those numbers without knowing what compensation structure they were coming from. And yet the complaint is devoid of such allegations. Pardon me if I hesitate to answer, because I want to be sure that I'm answering directly. The direct answer is that it doesn't matter what they were being paid while they were working in terms of the sit-out year when they were doing nothing. They were being paid a million dollars. Your point is they were being paid a lot for doing nothing. For doing nothing. Yes, ma'am. I thought that your implication was that these are substantial sums. They're substantial sums, but the inducement was we will pay you to do nothing, we will indemnify you if you're sued, we'll cover your damages if you're found liable. Now, the implication, we say it's plausible, although there are other plausible explanations, is that someone with that kind of temptation and possession of valuable trade secret information in addition to the revenues might be tempted to use it, and we show that they were making preparations to use it. I see my time has expired. I'm into my rebuttal time. I'll see you. Thank you. Thank you. May it please the Court. Brian Wilson for the Appellee's Ell Discovery, LLC, and Christopher Weiler. The District Court's decision should be affirmed because even after an amended complaint, extensive fact and expert discovery, and a three-day evidentiary hearing, DTI never pleaded plausible claims of wrongdoing against Ell Discovery or Mr. Weiler. DTI does not dispute that if a document heavily relied upon in a complaint contradicts the complaint's allegations, those allegations should be disregarded. DTI does not dispute that it never objected to the trial court considering the term sheet or the Ell Discovery employment agreement in resolving the motion to dismiss. Those concessions are fatal to nearly all the claims on appeal. After the legal conclusions and the allegations that can contradict those writings are set to the side, there's very little alleged against Ell Discovery or Mr. Weiler here. Payment of signing bonuses with, as Judge Carney pointed out, no context for what these employees were earning before. An indemnity agreement that was not a blanket, as DTI suggests, but had specific carve-outs in the event these employees violated any of their DTI obligations. Some meetings, an agreement to set up document review centers in Washington, D.C. and Canada, those do not rise to the level of plausible claims. With respect to the trade secrets, I think we did eventually establish that the one and only thing that Ell Discovery is alleged to have received is the historical revenue information, how much these four salesmen who worked for three big companies earned over a period of time. There are no allegations in the complaint that would lead one to conclude that these are trade secrets. There are no facts, for example, where our ---- Roberts. The allegation that during the sit-out year they met, they were putting together a business plan, they were preparing to violate.  Two reasons, Your Honor. First, preparing to compete is not a breach of this non-compete agreement. That's what Judge Rakoff held in denying the motion for preliminary injunction. Second, and I think more importantly, Ell Discovery is nowhere near any of those allegations. The post-DTI conduct by the employees that starts on paragraph 195, there's no allegation that Ell Discovery even knew about that, and those are the only appellees here. With respect to the sales figures, I wondered what your views were on the district court's conclusion that it was industry practice for e-discovery providers to ask potential hires for their past revenue figures. On what basis could he conclude that at a motion-to-dismiss stage? Well, Your Honor, it's something that could be subject to judicial notice. It's pretty common sense. I think under ICBAL, the fact that a trial court's allowed to use its judicial experience and common sense in resolving a motion-to-dismiss, that's certainly a fair inference. It was not disputed by DTI. But even if the court were to disagree with that, there are no facts pleaded about how DTI used that information in its business or how it had any competitive advantage. The only reason that DTI seems to be using this information for is to tell its salespeople they can't go and look for a new job. And under the Rogers-Casey case, that's not a permissible use of trade secret law. Likewise, as we heard from DTI this morning, you cannot contract to make something a trade secret. A trade secret has to meet certain legal requirements. Otherwise, I guess DTI would have contracted that every single thing about their existence was a trade secret, and then they could sue them for theft of trade secrets. That's simply not the law here. Could you also speak to the anomalous procedural posture of the amended complaint and the ruling while another complaint was pending? Yes, Your Honor. This case was proceeding very, very quickly. Significant fact and expert discovery. There was a preliminary injunction hearing. The parties had briefed the original motion-to-dismiss. At the end of that argument, Judge Rakoff asked the parties if they wanted to argue the motion-to-dismiss. DTI declined. We stood in our papers. They then filed their amended complaint, which they already had leave to do. And then after that, the Court did issue its order. And so because of that discrepancy, we went to DTI before we briefed the final motion-to-dismiss, and we said, are you going to amend again? Are you going to seek leave? There was a pre-motion teleconference, which Judge Rakoff requires, and they said, no, we're going to stand on our amended complaint. We're not going to seek leave. Because that was not transcribed, I put that in Docket Entry 79, my declaration, and you'll see it referenced at the end of the district court's decision. We said, okay, we are moving to dismiss with prejudice because under the Abu Dhabi case, the Denny case that's 40 years of precedent in this court, the same deficiencies are still there, so we think dismissal with prejudice is the next step. We cited that. In their response, they again said nothing about moving for leave to amend. They didn't even include that sort of generic statement, seeking leave, that this court said in Tannerite is inadequate. So they knew the problems, and we think, Your Honor, that was quite intentional because at this point in time, they had incredible discovery. They had depositions, documents. They had a complete forensic review of all of Mr. Weiler's devices, all of the former employees' devices, looking to see if anything had been transferred. Not that they thought about it, not that they were tempted, but they had actually done it, and they saw there was nothing. And so the silence you see in the amended complaint and the failure to request further leave is because under their obligations to the court, they could not have pleaded that El Discovery got anything else. They knew it, and so therefore they did not seek leave to amend. And so really now they're like the plaintiff in Gallup against Cheney that didn't seek leave in the trial court and then came to this court and said, Hey, that was an error. We should have had leave to amend. And the court here recognized it's never error for a district court to decline a request for leave that was never made. There simply was no request because we think there could have been no request. With respect to the so-called evidence the trial court relied upon, there's really nothing that DTI can point to besides the term sheet and the El Discovery employment agreement. Again, those were put to the court on the motion to dismiss. There was no objection from DTI, no claim that this was turning this into summary judgment. Will this ruling preclude, say, in two years, these individuals have come, they've been working for El Discovery, and all of a sudden a client relationship is blossoming with a former client of DTI. Will this ruling preclude them from coming back and charging that that was the result of misappropriation of information? If they have actual facts, and keep in mind, these three plaintiffs specialize in forensic services, so if they have actual facts that there was misappropriation, then sure, they could bring a claim. The claim would be ripe at that point. It was not ripe now because there has been no misappropriation. It's after-the-fact conduct. Correct, Your Honor. It's after-the-fact. I mean, the agreement requires them to sit out a year, both their contract with their former employee and the term sheet that you offered them. The information that they own, that they have in terms of the identities of the people that they dealt with, customer lists are very suspect with regard. I mean, there's nothing that is identified in the agreement as to being specifically a trade secret that they've identified that's forever off limits for them, is there? Correct, Your Honor. I mean, of course salespeople will know the clients who they've dealt with. It's in their head. They're not obligated to try and forget or go get a lobotomy. That interest that DTI has is served by the non-compete. They have a full year for DTI to bring in new salespeople to improve that relationship. After the end of that. This is all New York contract interpretation, right? I agree, Your Honor. And New York has dim view on customer lists with regard to trade secrets. It does, Your Honor, and on these facts that are pleaded, there's no reason to think that this is likely to be a trade secret. This is an aside, but what happened to the arbitrations? The arbitration, based on what's on the docket, they were compelled to arbitration. I know in the agreements, those are confidential proceedings. There has been no return to the district court. All right. So, Your Honors, we raised a number of alternative grounds to affirm as well. We're happy to stand on our papers on those, unless the Court has questions on that or anything else. We respectfully request this Court affirm. Thank you. Thank you. We'll hear the rebuttal. With such time as I have, I'd like to address the procedural posture because it's critical to the major brief law in the district court's order. In the district court's dismissal order, the court specifically relied on testimony adduced at the injunction hearing to rule that the information we were talking about in my opening is not protectable information as a matter of law, as a matter of law. But the finding in the PI order was as a matter of fact, and it was based on a former employee's testimony and Mr. Wyler's testimony, to which I've already made reference. There is no support cited in the order and no support argued here for the proposition that this information is not protectable as a matter of law. Instead, what happened was we filed our complaint. The PI was set for hearing. Record 302, the judge notes that there was a telephone conference. We told the court we wanted to file an amended complaint. The court said, wait until after the PI hearing. The PI hearing went forward, and then we filed our amended complaint. So when the motion to dismiss the amended complaint was heard, the court had the supposed benefit of the PI order and its findings, but it made unfair reference and made unfair use of that benefit by relying on the PI order that's been established in this court since 1985, that a court cannot rely on injunction hearing testimony to rule on a motion to dismiss. Now, once that keystone's removed, once the entire basis for finding we don't have a protectable trade secret in the information that was actually disclosed to El Discovery by the former employees, all the other findings fail. Does the complaint allege protectable trade secrets? Yes, it does, Your Honor. What does it say that shows other than a conclusory statement that these are protectable trade secrets? It alleges that it was disclosed in violation of the confidentiality agreement. How do you respond to the argument that it's not enough for parties to agree that something is a trade secret? You still have to show that it is under New York law. My answer is that's a question of fact. New York law is also, as we cite in our brief, that whether something is a trade secret or not is a question of fact. That's how the trial judge treats it. But what about revenues generally? I mean, this is not a question about you haven't alleged that they disclosed client identities, and you've had depositions and other things. You would seem to think, I would seem to think that you would have to have been more specific if you knew. You sought an injunction to stop them from doing something. Yes, Your Honor. And it would seem to me that you would have known if they'd contacted clients of yours, and you would have alleged that you were being damaged that way. That's what you were seeking to enjoin. But you didn't allege that, did you? Judge, we alleged that the information was taken from us in violation of the confidentiality agreement. But you didn't allege client identities. And, Judge, for all we know, because remember, this was at an – we were at an injunction stage then. Right. The sit-out year has ended, and we have no idea what's going on now. But at that time, we were only seeking injunction relief to stop them from giving this valuable information to El Discovery. So for all – You lost that. We lost that. You didn't feel what you could have done, but you chose not to do that. We filed our amended complaint, and the judge relied on testimony from the PI hearing to dismiss the amended complaint. And that error alone requires reversal. Because once you remove the notion that they didn't supply protected secrets, then you look completely differently on them taking information from us. That's a different question from whether you pled with specificity the information that was disclosed, which in the amended complaint, I think that's what the judge took you to task for, is that you weren't specific. You didn't allege anything other than the fact that trade secrets had been disclosed, but you never said what they were. Judge, I respectfully disagree. We specifically alleged the May 2016 email to El Discovery immediately after their meeting with Mr. Weiler. They had this meeting with Mr. Weiler. They discussed possible employment. That's not – that's alleged in the complaint, and it's apparently not disputed. Right. And then they sent the May 2016 email to Mr. Weiler and to an El Discovery investor with the revenue information after their meeting. We specifically alleged that in the complaint. And we specifically alleged that was protected information. And the only way we – That's an issue of fact as to whether that – knowing just the fact of the disclosure of revenue, whether that constitutes a trade secret, that's an issue of fact or an issue of law? We plead it as an issue of fact. I understand what you plead it as, but it has to reach a legal conclusion, doesn't it? The legal conclusion is that information that has value to us in our business, that we do not wish to be disclosed to our competitors. And we allege that's what it is. All right. Okay. Thank you. Thank you. We'll reserve decision. Okay.